[Crim. No. 417.   Department Two.—Dec. 19, 1898.]

THE PEOPLE, Respondent, v. LEON HILL, Appellant.

CRIMINAL LAW—HOMICIDE—DEGREE OF MURDER—INTOXICATION—INSTRUCTION.—Upon the trial of a defendant charged with murder in the first degree, where there is any evidence tending to show that the defendant was intoxicated at the time of the homicide, he is entitled to have an instruction given embracing in substance the statutory declaration as to the bearing of intoxication upon the degree of the crime, and a refusal to give such instruction entitles the defendant to a reversal of a judgment of conviction of murder in the first degree.

APPEAL from a judgment of the Superior Court of Fresno county and from an order denying a new trial. J. R. Webb, Judge.

The facts are stated in the opinion of the court.

Frank H. Short, for Appellant.

W. F. Fitzgerald, Attorney General, and C. N. Post, Deputy Attorney General, for Respondent.

McFARLAND, J.—The defendant was convicted of murder
in the first degree, and was sentenced to a life imprisonment
in the state prison. He appeals from the judgment and from
an order denying a new trial. The appellant is a youth, and
at the time of the homicide upon which the charge of murder
was based he was only eighteen years and some months old.
The homicide occurred on a road about a mile and a half from
a resort known as the Fresno Hot Springs, at which place there
was a hotel, saloon, croquet ground, et cetera. About 9 o'clock
in the evening of June 27, 1897, the appellant left said springs
in a buggy with a young companion named Tony Loveall, to
go to his home, which was about five or six miles distant. At
the same time the deceased, Lloyd Duke, also left the springs
in a buggy, in which were also two other persons named Smoot
and Taylor. All these persons had been together in the saloon
at the springs, where something had been said about a bet on
a wrestle between the defendant and the deceased, in which
the deceased said that he would either wrestle or fight the defend-
ant. Some months before that time the deceased had whipped
the appellant at another place. After the parties had started the
buggies were brought close together several times, and each had
passed the other, and there was considerable rough and angry
talk between the parties. Smoot was left at his house, which
was a short distance from the springs. At that time the buggy in
which the appellant rode was ahead, and, some of the harness be-
ing disarranged or broken, the appellant had stopped his buggy
and had gone to the side of one of his horses to repair the harness.
At this point, which was about one and a half miles from the
springs, the deceased and Taylor overtook the appellant, and there
is testimony that the deceased in an angry manner asked the ap-
pellant and his companion what they were doing, and said, "Stop,
you sons of bitches; I will fix you." The deceased then jumped
out of his buggy on the ground, when the appellant, who had
returned to his buggy, also jumped to the ground, taking with
him a gun which had been in the buggy, and hollered to the
deceased, "Stop." The parties were then very close together,
but it was dark and dusty, so that the movements of the de-
ceased and the appellant could not be very distinctly seen. Im-
mediately afterward the appellant fired a shot, which caused the

death of the deceased. The appellant testified that he thought
the deceased, who was an older and larger man, was about to
attack him, and that he shot in self-defense. The parties were
all boisterous and noisy and seemed to act with a good deal
of recklessness. There was testimony to the effect that the
defendant sought to prevent the deceased from passing him in
his buggy; and there are many other circumstances not neces-
sary to be detailed under the views we take of the case.

The defendant asked the court in writing to give the follow-
ing instruction: "If you should believe from the evidence that
at the time of the killing the defendant in this case was in-
toxicated, or under the influence of intoxicating liquors, you may
and should take into consideration such fact in determining
the degree of the crime of which the defendant is guilty, if
you believe him guilty of any crime." The court refused to
give this instruction and did not give any instruction
at all on the subject of intoxication; and the refusal to
give this instruction, or any other of a similar character,
is one of the main errors relied on for a reversal. There
is no doubt that this instruction was correct, and that ap-
pellant was entitled to have it given, unless some special rea-
son appears warranting its refusal. Section 22 of the Penal
Code provides that "whenever the actual existence of any par-
ticular purpose, motive, or intent is a necessary element to con-
stitute any particular species or degree or crime, the jury may
take into consideration the fact that the accused was intoxicated
at the time, in determining the purpose, motive, or intent with
which he committed the act"; and it has been repeatedly held
that in a trial for murder the jury, in determining whether there
was that "willful, deliberate, and premeditated killing" which
constitutes murder in the first degree, may consider the fact
that the accused at the time of the homicide was intoxicated.
A few of the cases to this point are the following: *People v.
Valencia,* 21 Cal. 544; *People v. King,* 27 Cal. 507; *People v.
Ferris,* 55 Cal. 588; *People v. Jones,* 63 Cal. 168; *People v.
Bruggy,* 93 Cal. 476; *People v. Vincent,* 95 Cal. 436; *People v.
Lane,* 100 Cal. 379. The attorney general admits that the in-
struction is upon its face correct, and that it should be given
in cases where the facts warrant it, but he claims that in the

case at bar there was no sufficient evidence of the intoxication of the appellant at the time of the homicide to make the instruction applicable. But this contention cannot be maintained. There certainly was evidence strongly tending to show that appellant was intoxicated, and sufficient to put the question of his intoxication within the province of the jury. The defendant and Loveall had gone to the said hot springs for the first time on the day of the homicide, about 2 o'clock in the afternoon, and had remained there until about 4 o'clock. During that time they were in the saloon a part of the time, although° it does not appear affirmatively that the defendant drank at the bar; but when they left they purchased a bottle of whisky and took it with them into the buggy in which they were riding. They then drove to appellant's home and to other places, and returned to the springs somewhere between 7 and 8 o'clock in the evening. Shortly before the homicide occurred, and while they were in the buggy, appellant drank the last whisky that was left in the bottle. These facts are not, perhaps, very conclusive evidence that the appellant and Loveall actually drank the whole contents of the bottle, but it was expressly testified to by witnesses that a short time after they returned to the springs appellant was intoxicated. Soon after they had returned to the springs the appellant and Loveall were walking along the road from the croquet ground to the hotel, and two boys named Crump were walking in front of them. A short distance ahead of them on the road were three ladies—Mrs. Motley, Mrs. Gregory, and Mrs. Forsyth, and as the appellant and his companion approached closely to the ladies the latter stepped off the road a few feet into the shadow of a cabin that stood there, to let them pass. Mrs. Motley testified as follows: "We thought the gentlemen were intoxicated; their manner was boisterous and loud, and we stepped in behind the cabin to let them pass"; and again, "We thought they were intoxicated, and we stepped behind a cabin"; and again, "The parties who seemed to be intoxicated were behind, in the rear of the others. They were close enough before we stepped out that we could notice that they were intoxicated"; and again, "As they were coming Mr. Hill was staggering, but I did not notice Tony, whether he was staggering or not." Mrs. Forsyth, having testified that the ladies stepped

out to the cabin, said: "The occasion of our stepping beside that cottage was we wanted to let them pass ahead of us. I thought they were all drunk." This occurred, according to the testimony of Mrs. Motley, about 8 o'clock, or between 8 and 9. She was not certain how long it was before the appellant and the deceased drove away from the springs in buggies, but she places it from a few minutes to a half hour, although in one part of the testimony she says that it might have been "nearly an hour." After this the appellant and his companions went immediately to the saloon and there drank more. It does not appear how many drinks they took then at the saloon, although it clearly appears that the defendant took one drink, and there is some evidence that he took two. The parties then all started on the road in their buggies, and before the homicide appellant took the last drink out of the bottle, as before stated. Therefore it certainly cannot be truly said either that there was no evidence, or that there was only slight evidence, of appellant's intoxication at the time of the homicide. There was evidence that shortly before the homicide he actually drank some liquor; there was evidence from which it could be properly inferred that he had drank a great deal of liquor; and there was express testimony of witnesses that within an hour of the homicide he was drunk—which testimony was competent to prove the fact (*People v. Monteith,* 73 Cal. 3; *San Diego etc. Co. v. Neale,* 78 Cal. 77), and it was shown that between that time and the time of the homicide he drank at least twice, and perhaps oftener. The facts here are very different from those in *People v. Kloss,* 115 Cal. 567. In that case the homicide was committed on April 18th, and the only evidence as to the intoxication of the defendant in that case at the time of the homicide was that he was addicted to heavy drinking and that "he had been drinking on April 17th"; and in the opinion of the court it is stated that the evidence "does not show how much or how often he had been drinking on the 17th, or at what hour, or that he had at any time reached the stage of intoxication." Of course, if a person kills another under such circumstances that the killing is neither manslaughter nor excusable or justifiable homicide, he is guilty of murder, although he may have been intoxicated at the time of the homicide; but murder is not neces-

sarily murder in the first degree; in order to be of the first degree the killing must have been "willful, deliberate, and premeditated"; in determining whether or not the killing was so willful, deliberate and premeditated as to constitute murder in the first degree, it is proper for the jury to consider how much his mental condition at the time was affected by intoxication, and, there being an express statutory declaration upon the subject of intoxication, a defendant in a murder case is entitled to have an instruction embracing such statutory declaration given by the court to the jury where there is evidence which makes it applicable; and, for the refusal of the court to give the instruction under discussion the judgment must be reversed and a new trial ordered.

There is not much else necessary to be said for the instruction of the court upon another trial. The appellant asked the court to give a great many instructions which were refused; many of them were correct, but an examination of the record shows, we think, that they were all substantially embraced in other instructions which were given; and therefore we do not see, at present, any prejudicial error committed by refusing said instructions.

The court did not err in overruling appellant's objections to testimony given by the witnesses Seacord, Motley, and Forsyth, with respect to certain declarations made by the appellant.

It is not necessary to discuss the point made by appellant as to the alleged misconduct of the assistant counsel for the prosecution in his closing argument; such point will probably not arise upon another trial. And as a new trial is to be ordered it is, of course, not necessary to examine that ground of the motion which consists of newly discovered evidence.

The judgment and order appealed from are reversed, and the cause remanded for a new trial.

Henshaw, J., and Temple, J., concurred.