STATE, Respondent v. PLENTY HORSE, Appellant

(184 N.W.2d 654)

(File No. 10765. Opinion filed March 3, 1971)

**William J. Janklow,** Rosebud, for defendant and appellant.

**Gordon Mydland,** Atty. Gen., **Thomas R. Vickerman,** Asst. Atty. Gen., Pierre, **Eugene Jones,** State's Atty., White River, for plaintiff and respondent.

HANSON, Judge.

Adolph Plenty Horse, a member of the Rosebud Sioux Tribe of American Indians, was charged with the crime of forgery in the third degree. He was tried and found guilty by a jury in the Circuit Court of Mellette County. On appeal, he contends the jury panel should have been quashed because of the systematic exclusion of members of his race from the jury list.

Plenty Horse timely moved to quash the jury panel before commencement of his trial. Although Indians constitute a substantial per cent of the total population of Mellette County, it appears from evidence introduced at the hearing that only token numbers of their race have ever appeared on its jury lists.

The procedure for selecting and drawing jury lists and panels in this state is set forth in Chapter 16-13 SDCL. In summary, a jury list is required for each county from which all grand and petit jurors are drawn. The number of names to be placed on the jury list is designated annually by order of the circuit court. Each organized city, town, township, and the combined unorganized townships constitutes a jury district within a county. Each jury district is entitled to pro rata representation on the master county jury list as computed by the clerk of courts according to the total vote cast for governor at the last general election. The boards of jury selecttors are the governing board of each city or town, the board of supervisors of each organized township and the board of county commissioners for the combined unorganized district. Each year the clerk of courts is required to requisition the jury selectors of each district to select and return a list of the names and addresses of persons deemed eligible and suitable for jury service. The number requisitioned from each district is twice the number apportioned. After the district jury lists are returned a board consisting of the county auditor, treasurer, and sheriff draws from each jury district list the number of names apportioned to each district. The names so drawn constitute the county jury list from which all jury panels are drawn as needed and ordered.

A defendant's constitutional right to the equal protection of the law is violated by the deliberate or purposeful

exclusion of, or discrimination against, members of his race in the jury selection process. 1 A.L.R.2d 1291 Anno. Jury Service—Discrimination. The protection of the Fourteenth Amendment is not limited to whites and negroes. It applies to any identifiable group or race which may be the subject of community prejudice. Hernandez v. Texas, 74 S.Ct. 667, 347 U.S. 475, 98 L.Ed. 866, and it is immaterial whether the discrimination is caused or created by the legislature, the courts, or by administrative officials involved in the jury selecting process, Carter v. Texas, 177 U.S. 442, 20 S.Ct. 687, 44 L.Ed. 839.

The right to be free from discrimination does not entitle a defendant in a criminal case "to demand a proportionate number of his race on the jury which tries him nor on the venire or jury roll from which petit jurors are drawn. (citation of authorities) Neither the jury roll nor the venire need be perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group." Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759. All a defendant can demand is to be indicted by a grand jury or tried by a petit jury from which members of his race have not been intentionally excluded because of race or color. Virginia v. Rives, 100 U.S. 313, 25 L.Ed.667.

The burden of proving purposeful jury discrimination is upon the defendant alleging it. However, a prima facie case of unconstitutional exclusion may be made by showing a wide disparity between the total number of a racial group and the group's relatively small percentage representation on the county jury lists. When a prima facie case is made out, the burden shifts to the state to explain the disparity, Norris v. Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074; Whitus v. Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599; Coleman v. Alabama, 389 U.S. 22, 88 S.Ct. 2, 19 L.Ed.2d 22; Jones v. Georgia, 389 U.S. 24, 88 S.Ct. 4, 19 L. Ed.2d 25, and Sims v. Georgia, 389 U.S. 404, 88 S.Ct. 523, 19 L.Ed.2d 634.

In the present action it appears that Indians constitute 29.9 per cent of the total population of Mellette County. However, only about 8 per cent were represented on the

county jury lists in 1967, 1968 and 1969. There were no Indian names certified from 18 of the 23 jury districts in 1967, none from 19 of the districts in 1968, and none from 20 of the districts in 1969. Although the population of Cedar Butte Township is 60 per cent Indian there has never been a person of Indian descent certified on its jury lists during the past 10 years. Similarly, with an Indian population in excess of 60 per cent Norris Township has only returned one Indian name for jury duty during the past ten years.

■ Such evidence is sufficient to establish a prima facie case of racial discrimination in the composition of the county jury list from which defendant's petit jury was drawn. Practically the same percentage of racial jury representation to total population was found to be constitutionally offensive by the United States Supreme Court in Whitus v. Georgia, supra, and Sims v. Georgia, supra.

The prima facie case of racial discrimination was not satisfactorily rebutted by mere denial of systematic exclusion of Indians from the jury lists because of race or color. In considering the evidentiary worth of similar self-serving declarations by jury selectors the United States Supreme Court said the long continued exclusion of negroes from jury service "could not be met by mere generalities. If, in the presence of such testimony as defendant adduced, the mere general assertions by officials of their performance of duty were to be accepted as an adequate justification for the complete exclusion of negroes from jury service, the constitutional provision * * * would be but a vain and illusory requirement", Norris v. Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074.

The general attitude of the jury selectors in Mellette County is reflected in the following testimony of one of the township supervisors:

"Q. There has never been an Indian picked from Cedar Butte to serve since 1961?

A. No.

Q. Are there any Indians living in the Cedar Butte township?

A. Well, there is a few Indians.

Q. Is it not true a substantial number live there?

A. I wouldn't say so.

Q. In fact, over half the township is Indians?

A. About half, I imagine.

Q. Is there any reason why no Indian has ever been picked from Cedar Butte township for jury duty since and including 1960?

A. No. We pick the jurors right by qualifications set forth by the laws of South Dakota.

 \* \* \* \*

Q. You subscribe to those qualifications?

A. Yes.

Q. Are there no Indians in Cedar Butte that meet the qualifications?

A. No.

Q. There are no Indians at all?

A. I don't know that there are.

Q. Some can read and write English?

A. I wouldn't say that.

Q. Or understand the English language?

A. I wouldn't say that.

Q. Upright character?

A. I wouldn't say that.

Q. Not convicted of a felony?

A. I wouldn't say that.

Q. Did you ever do any investigation?

A. The reason we haven't picked an Indian on a jury is because it is hard to know what qualifications they have. They come and go.

Q. You never went to any trouble to find out what their qualifications were?

A. I didn't know it was my duty.

Q. Do you know all of the non-Indians in Cedar Butte township?

A. Yes.

Q. All personally?

A. Yes.

Q. Do you know their qualifications?

A. Yes.

Q. But you don't know any qualifications of any Indians in Cedar Butte township?

A. I didn't say that.

Q. Do you know of some?

A. That are qualified?

Q. Yes.

A. I know of one old Indian.

Q. How come this old Indian has never been on the jury?

A. Because he is over seventy."

■ Defendant's prima facie case was also not overcome by testimony, such as the above, to the effect that the town and township officials were not familiar with the qualifications of Indians to act as jurors. In response to a similar contention in Cassell v. Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed 839, the United States Supreme Court stated "When the [jury] commissioners were appointed as judicial administrative officials, it was their duty to familiarize themselves fairly with the qualifications of the eligible jurors of the county without regard to race and color. They did not do so here, and the result has been racial discrimination. We repeat the recent statement of Chief Justice Stone in Hill v.

Texas, 316 U.S. 400, 404, 62 S.Ct. 1159, 1161, 86 L.Ed. 1559 [1562]: 'Discrimination can arise from the action of com-' missioners who exclude all negroes whom they do not know to be qualified and who neither know nor seek to learn whether there are in fact any qualified to serve. In such a case discrimination necessarily results where there are qualified negroes available for jury service.' " We, therefore, conclude defendant's motion to quash the jury panel should have been granted and a new panel or a special venire ordered.

■ As defendant will be entitled to a new trial, another issue requires consideration. This involves the following instruction requested by defendant and refused by the court:

> "You are instructed that no act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his having been in such a condition. But whenever the actual existence of any particular purpose, motive, or intent is a necessary element to constitute any particular species or degree or crime, you, the jury, may take into consideration the fact that the accused was intoxicated at the time in determining the purpose, motive, or intent with which he committed the act."

The proposed instruction is practically a verbatim recitation of SDCL 22-5-5. The meaning of the statute is clear. In South Dakota voluntary intoxication is not a defense to a crime involving a general criminal intent, or mens rea, which may be inferred from merely doing the forbidden act. But whenever a particular or specific purpose, motive, or intent is necessary to constitute a particular crime, or degree of crime, the jury may properly consider the voluntary intoxication of the accused to determine the existence of the required purpose, motive, or intent. See Anno.—Voluntary Intoxication—Defense, 8 A.L.R.3d 1236. See also S.D. Criminal Pattern Jury Instructions 2-14-6.

■ Intent to defraud is an essential element of the crime of forgery in the third degree. There was evidence defendant had been drinking at the time of the alleged offense

and was "slightly intoxicated" and the requested instruction or its pertinent part should have been given, State v. Kapelino, 20 S.D. 591, 108 N.W. 335, as there was sufficient proof to put the issue of intoxication "within the province of the jury", People v. Hill, 123 Cal. 47, 55 P. 692; People v. Coyne, 92 Cal.App.2d 413, 206 P.2d 1099.

Reversed.

WINANS and WOLLMAN, JJ., concur.

RENTTO, P. J., and BIEGELMEIER, J., concur specially.

RENTTO, Presiding Judge (concurring specially).

I concur in the opinion, but do not subscribe to the rule of law announced in the quotation therein, cited with approval, from Cassell v. Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839. As I read it our jury selectors would have to become personally acquainted with all the eligible jurors in their respective districts. This I think would place an unrealistic burden on them in our larger cities. While the court held that there was illegal racial discrimination in the selection of the grand jury involved in the Cassell case, only four and thus not a majority of the eight participating judges concurred in the quoted rule.

BIEGELMEIER, J., joins in this concurrence.